UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL DAVID SHEEKS,

      Plaintiff,                         Civil Action No. 11-15457

v.                                   HON. LAWRENCE P. ZATKOFF
                                      U.S. District Judge
COMMISSIONER OF SOCIAL         HON. R.  STEVEN WHALEN
SECURITY,                       U.S. Magistrate Judge

      Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Michael David Sheeks brings this action under 42 U.S.C. §405(g) challenging a final  decision of Defendant Commissioner denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment [Doc. #22] be GRANTED, and that Plaintiff's Motion for Summary Judgment [Doc. #15] be DENIED.

## PROCEDURAL HISTORY

On October 19, 2007, Plaintiff filed an applications for SSI and DIB, alleging disability as of September 23, 2003 (Tr. 18, 145-147, 148-151).  After the initial denial of

the claims, Plaintiff filed a request for an administrative hearing, held on September 2, 2009 in Chicago, Illinois before Administrative Law Judge ("ALJ") Ayrie Moore (Tr. 41). Plaintiff, represented by attorney Gregory L. Gilbert, testified by teleconference from Detroit, Michigan (Tr. 44-81). Vocational Expert ("VE") Craig Johnston also testified (Tr. 81-93). On January 29, 2010, ALJ Moore found Plaintiff not disabled (Tr. 35). On November 2, 2011, the Appeals Council denied review (Tr. 1-6). Plaintiff filed for judicial review of the Commissioner's decision on December 13, 2011.

## BACKGROUND FACTS

Plaintiff, born October 16, 1961, was 48 at the time of the administrative decision (Tr. 35, 145). He obtained a GED and received training in basic auto repair and welding (Tr. 174). He worked previously as an "order parts puller," and laborer (Tr. 170, 182). His application for benefits alleges disability as a result of seizures, migraines, and heart problems (Tr. 169).

### A.    Plaintiff's Testimony

Plaintiff testified that he currently lived in a mobile home with his mother (Tr. 44). He reported that his driver's license had been revoked for driving under the influence (Tr. 45). Plaintiff stated that he presently attended AA meetings and did not drink (Tr. 45). He reported that his brother drove him to the hearing (Tr. 45). Plaintiff stated that he was able to read and write but noted that he was placed in special education classes in elementary school due to his inability to pay attention (Tr. 45). He stated he received training in welding and small engine repair after obtaining the GED (Tr. 46).

-2-

*Plaintiff's attorney interjected to state that Plaintiff was amending his alleged onset of disability date to October 19, 2007* (Tr. 46).

Plaintiff reported that he had not worked since October 19, 2007 (Tr. 47). He indicated that his most recent job was working in a warehouse sometime in the 1990s (Tr. 48). He admitted that he had been "in and out of prison" (Tr. 48). Plaintiff indicated that he had begun experiencing Carpal Tunnel Syndrome ("CTS") in 2009, noting that the condition caused right-sided hand, wrist, arm, elbow, and shoulder pain  (Tr. 49).

Plaintiff alleged that he was unable to work, noting that moderate exertional activities, such as mowing a lawn, caused seizures and dizziness (Tr.  52). He indicated that the seizures were attributable to a head trauma sustained in an auto accident (Tr. 52). He noted that he had received emergency treatment in the past month and was held overnight (Tr. 56). Plaintiff stated that his past criminal behavior was attributable to alcohol abuse (Tr. 58). He stated that he had experienced three seizures in the past nine months (Tr. 59). He indicated that his seizure medication improved the condition to the point where he could tell when a seizure was imminent, at which time he retired to his bedroom (Tr. 60). He stated that the effects of a "bad seizure" were followed by a two to three day recovery period (Tr. 60). Upon further questioning, Plaintiff acknowledged that his prescribed medicine, Elavil and Prozac, were antidepressives, not seizure medication (Tr. 61-66).

Plaintiff alleged that symptoms of CTS prevented him from using his hands for more than a few minutes, stating they his fingers became "tingly" (Tr. 66). He stated that a cortisone shot did not improve the condition (Tr. 67). He stated  that although CTS and

-3-

rotator cuff surgeries had been recommended, financial constraints prevented him from undergoing the procedures (Tr. 67, 70-71). He indicated that his treatment for CTS was currently limited to the use of a wrist splint (Tr. 67). He added that he experienced elbow and shoulder pain and difficulty gripping small objects (Tr. 67, 74). He reiterated that he regularly became dizzy and overheated (Tr. 68). He stated that his medical conditions made him depressed, adding that his anxiety around other people caused him to lose control of his bladder (Tr. 68).

Plaintiff opined that the psychotropic medication did not help his insomnia and created the side effect of impotence (Tr. 72). He stated that he received the medication from a primary care physician and had not undergone psychiatric treatment (Tr. 73). He stated that he experienced frequent panic attacks and was currently experiencing one even as the hearing progressed (Tr. 73). He denied, in effect, that physical limitations limited his ability to sit, but stated that he got "jittery" sitting for long periods (Tr. 75). He reported racing thoughts and the inability to concentrate (Tr. 77-78). He admitted that he smoked (Tr. 76).

Plaintiff stated that he had no friends and did not interact with neighbors (Tr. 77). He reported that he assisted his mother with household chores and did his own laundry (Tr. 79). He stated that he was unable to "keep up" with a computer but enjoyed going fishing with his children and going to garage sales with his brother (Tr. 79-80). He stated that he last fished approximate five months before the hearing (Tr. 80). Plaintiff indicated that he liked to read science fiction (Tr. 80). He denied club membership (Tr. 80). He reiterated that he had not used alcohol in several years (Tr 81).

**B.     Medical Evidence**[1]

### 1. Treating Sources

In September, 2003, Plaintiff sustained injuries in a motor vehicle accident (Tr. 224-245).  A CT of the cervical spine showed a rib fracture (Tr. 231).  A CT of the brain showed "[n]o acute intracranial injury . . ." (Tr. 232).  February, 2006  Michigan Department of Corrections ("MDOC") treating notes state that Plaintiff took Excedrine Migraine for headaches (Tr. 343).   March, 2006, MDOC notes state that Plaintiff denied symptoms of dizziness, headaches, or the use of non-prescription medication (Tr. 346).  In October, 2006, Plaintiff complained of dizzy spells and anxiety related to his upcoming parole (Tr. 269).  November, 2006 records state that Plaintiff was not taking psychotropic medication and did not have a history of mental health problems (Tr. 331-332).  December, 2006 records state that Plaintiff had been prescribed Elavil (Tr. 261).  January, 2007 MDOC examination notes showed the presence of hyperlipidemia and obesity (Tr. 249).

In May, 2007, a health summary by Packard Community Clinic stated that Plaintiff reported a history of seizures and migraine headaches (Tr. 356).  He reported that he currently experienced insomnia, noting that he felt "guilty for being a burden to his family" and was trying to find a job (Tr. 352).  June, 2007 treating notes state that Plaintiff currently took Celexa, Prozac, Elavil, and Valium for depression (Tr. 351).

---

[1]Medical evidence unrelated to the application for benefits, while reviewed in full, has been omitted from discussion.

In May, 2008, Plaintiff complained of "trigger finger" of the right middle finger (Tr. 402).   Michael S. Fitzsimmons, M.D. administered a steroid injection (Tr. 402).   A November, 2008 EKG was negative for abnormalities (Tr. 497).

In January, 2009, John M. Wardner, M.D. noted that nerve conduction studies showed median mononeuropathy at both wrists, greater on the right than left (Tr. 400, 495).   The following month, orthopaedic surgeon Dean S. Louis, M.D. characterized Plaintiff's symptoms of CTS as "mild," opining that he was not a candidate for surgery (Tr. 435, 455).   Dr. Louis recommended the use of custom-made splints, advising Plaintiff to modify his activity when symptomatic (Tr. 435).   Plaintiff indicated that for the past year, he had been "activity employed as a handyman and grass cutter" (Tr. 434).   In May, 2009 Plaintiff reported that his seizures were characterized by spasms, loss of bladder control, nausea, dizziness, headaches, and muscle soreness (Tr. 457).   In August, 2009, Plaintiff received emergency treatment for dizziness and nausea (Tr. 478).   An exercise stress echocardiogram was negative for abnormalities (Tr. 468, 484).   The following month, a CT of the brain was unremarkable (Tr. 487).

In November, 2009, neurologist Simon Glynn, M.D. noted Plaintiff's reports of "small" seizures once every several months which would progress to grand mal seizures "infrequently" (Tr. 499).   He stated that during grand mal seizures, he would become incontinent, and afterwards, experience dizziness for hours (Tr. 499).   Plaintiff reported that he had never taken anti-epileptic medication (Tr. 498).   Dr. Glynn noted that Plaintiff was

-6-

a good historian and exhibited fluent speech (Tr. 500).  He demonstrated full strength in all extremities (Tr. 500).  An EEG was normal (Tr. 501).

## 2. Non-Examining Sources

### a.  Physical Conditions

In January, 2008, Elizabeth W. Edmond, M.D.  examined Plaintiff on behalf of the SSA (Tr. 370-373).  She noted that Plaintiff worked previously as a construction worker and had sustained a head injury in a motor vehicle accident  (Tr. 368).  Plaintiff reported that during the incarceration following the 2003 accident, he began experiencing seizures (Tr. 368).  He also reported migraine headaches and high cholesterol counts, but stated that he stopped taking Lipitor when released from prison in 2007 (Tr. 368).  Plaintiff reported that he took Elavil and Fluoxetine prescribed by Dr. Ryan (Tr. 368).  He reported incontinence as a result of both seizure activity and urinary urgency (Tr. 368).  Plaintiff also alleged insomnia (Tr. 369).

Plaintiff exhibited a normal gait and did not require the use of a cane (Tr. 369).  Plaintiff demonstrated difficulty balancing (Tr. 369).  He was able to squat and get on and off the examination table independently (Tr. 369).  Dr. Edmond noted a history of enlarged prostate (Tr. 370).  She recommended the use of a cane on uneven ground (Tr. 370).  He exhibited normal manipulative abilities (Tr. 370).

The following month, William Joh, M.D. performed a non-examining Physical Residual Functional Capacity Assessment, finding that Plaintiff could lift 50 pounds occasionally and 25 frequently; sit, stand, or walk for six hours in an eight-hour workday;

and push and pull without limitation (Tr. 375). Dr. Joh found the absence of additional limitations (Tr. 376-378).

Dr. Edmond reexamined Plaintiff in January 16, 2009 (Tr. 403-408). Plaintiff, reiterating that he experienced seizures, stated that the "grand mal" seizures typically lasted about 12 minutes (Tr. 403). He stated that he experienced migraines and currently took Elavil, Trazodone, and Prozac for depression (Tr. 403).

Plaintiff demonstrated "slight difficulty with balance" when walking, but was able to get on and off the examination table without difficulty (Tr. 404). The rest of the examination was unremarkable (Tr. 404). Dr. Edmond found that "[f]or prolonged walking, uneven ground or slopes, the use of a cane may give an additional point of balance" (Tr. 405). The following month, S. Obri, M.D. conducted a one-time examination, noting Plaintiff's reports of migraines, hyperlipidemia, and seizures (Tr. 437-438). Plaintiff grip strength in both hands was stated as 52 kilograms on one page (Tr. 438) and 32 on another[2] (Tr. 438, 441). Plaintiff did not demonstrate problems performing manipulative activities (Tr. 438-441). The following month, imaging studies of the chest were unremarkable (Tr. 445). Muhammad Mian, M.D. completed a Residual Functional Capacity Assessment, finding that Plaintiff was capable of lifting 50 pounds occasionally and 25 frequently and sitting, standing, and

---

[2]A grip strength of 32 kilograms is considered "very poor" while 52 is "above average." http://www.topendsports.com/testing/tests/handgrip.htm. Because Dr. Obri found no evidence of problems problems pushing, pulling, carrying, or making a fist, it appears that the "32 kilograms" finding was a misstatement (Tr. 440-441).

walking for six hours in an eight-hour workday (Tr. 447).  Dr. Mian found the absence of non-exertional limitations (Tr. 448-450).

### b.  Mental Conditions

In January, 2008, Suzann M. Kenna, M.A. performed a one-time psychological evaluation of Plaintiff, noting his allegations of long-term depression (Tr. 363).  Plaintiff reported that his last seizure was two weeks earlier (Tr. 363).  He stated that he was on good terms with his former wife and saw his children as often as he could (Tr. 364).  He indicated that his criminal convictions were associated with alcohol abuse (Tr. 364).  He reported anxiety (Tr. 365).  Kenna observed that Plaintiff was in contact with reality but had low self-esteem (Tr. 364).  He exhibited an appropriate affect with "logical and organized speech" (Tr. 364).  Kenna assigned Plaintiff a GAF of 45-50 with a guarded prognosis[3] (Tr. 365).  She found that he was able to manage his own benefit funds (Tr. 366).

The following month, Kathy A. Morrow performed a Psychiatric Review Technique, finding the presence of depression, anxiety, and substance abuse disorders (Tr. 386, 389, 391, 394).  Under the "'B' Criteria," Morrow found that Plaintiff experienced mild restriction in activities of daily living and social functioning and moderate limitations in maintaining concentration, persistence, or pace (Tr. 396).  The same month, Morrow completed a Mental Residual Functional Capacity Assessment, finding that Plaintiff experienced moderate

---

[3] GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 34 (*DSM-IV-TR* )(4th ed.2000).

limitations in the ability to understand, remember, and carry out detailed instructions, and maintain attention for extended periods (Tr. 382). She concluded that he could engage in "simple work activity and "sustain a simple routine independently;" "tolerate low stress social demands;" and "adapt to simple changes in routine" (Tr. 384).

Plaintiff underwent a second consultive psychological examination in January, 2009 (Tr. 409-413). Psychologist Terrance Alexander Mills, Ph.D. noted Plaintiff's statement that he felt "uncomfortable in crowds" but had "a positive relationship" with family (Tr. 409). Dr. Mills noted that Plaintiff interacted appropriately but exhibited low self-esteem (Tr. 410). Plaintiff reported that he was independent in hygiene and grooming needs (Tr. 410). He was unable to subtract by 7s but demonstrated the ability to think abstractly (Tr. 410). Wechsler Adult Intelligence Scale ("WAIS-III") testing showed a full-scale IQ of 72 (Tr. 411). Dr. Mills diagnosed Plaintiff with "borderline" intellectual functioning (Tr. 411). He found that Plaintiff's "ability to understand, retain, and follow simple instructions and perform simple, repetitive, and routine tasks appear[ed] mildly impaired" (Tr. 411). Dr. Mills found further that Plaintiff's ability to interact with coworkers, supervisors, and the public and respond to changes in his environment "appear[ed] adequate" (Tr. 411). Dr. Mills cautioned that he "[was] not a vocational expert and work inpingement, if any, [was] based on the average work scenario" (Tr. 411). He noted that his statement was limited to "[his] specialty as a fully licensed psychologist" (Tr. 411). He assigned a GAF of 50, finding that Plaintiff would be unable to manage his benefit funds (Tr. 411-412).

-10-

The following month, a Psychiatric Review Technique completed by Zahra Khademian, M.D. found the presence of an organic mental disorder (cognitive) and an affective disorder (depression) (Tr. 414-415, 417).  Under the "'B' Criteria," Dr. Khademian found moderate impairments in activities of daily living, social functioning, and maintaining concentration, persistence, or pace (Tr. 424).  Dr. Khademian also completed a Mental Residual Functional Capacity Assessment, finding that Plaintiff was moderately limited in the ability to carry out detailed instruction, maintain attention for extended periods, perform activities within a schedule, complete a workweek without interruptions from psychologically symptoms, and respond appropriately to criticism (Tr. 429).  Dr. Khademian found that Plaintiff's mental status exam "was fairly unremarkable except for decreased . . . memory/concentration" (Tr. 430).  Noting the "borderline" intellectual functioning, she nonetheless found that Plaintiff "retained the ability to do simple unskilled tasks [o]n a regular basis at this point" (Tr. 430).

## C. Vocational Expert Testimony

VE Peters classified Plaintiff's past relevant work as a construction laborer as unskilled at the heavy exertional level and work as a material handler as semiskilled/heavy[4]

---

[4]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

-11-

(Tr. 85-86).  The ALJ posed the following hypothetical question to the VE, taking into account Plaintiff's age, education, and work experience:

> "[A]ssume the claimant can perform at the light exertional level of work, primarily related to some of his right-arm problems.  He can be exposed to no heat, work no extremes and no heat from the weather.  He cannot have concentrated exposure to pulmonary irritants, and he should not work around hazards: moving machinery, heights. . . . [M]entally, because of his  –  he described some limitations in concentration when he's not feeling relaxed, so he would not be able to concentrate on complex work tasks; but he does retain the ability to perform simple, routine, repetitive work tasks on a sustained basis.  And also, I'm going to say that his work should require only incidental contact with the public.  Now, given those limitations, I assume he would not be able to perform his past work, correct? (Tr. 86).

The ALJ added that the hypothetical limitations would include "ready access to a bathroom" (Tr. 87).  The VE testified that although Plaintiff would be unable to perform his past relevant work, he could perform the light unskilled work of an assembler (20,000 position in the State of Michigan); parts inspector (3,000); and hand packager (10,000) (Tr. 87).  The VE testified that if the above-limited individual were limited to only occasional use of his right arm for repetitive handling, no jobs would be available (Tr. 88).  The VE testified that if the "occasional use of . . . right arm" restriction were eliminated and replaced with "no overhead lifting or work above the shoulder level," it would not affect the above job findings (Tr. 89).  Likewise, the VE testified further that if the same individual were prone to three seizures each year at unpredictable times, and/or, precluded from "working collaboratively" the job findings would not be affected (Tr. 89-90).  The VE stated that if Plaintiff's

-12-

deficiencies in "concentration, persistence, and pace" took him off-task 75 percent of the time, all work would be precluded (Tr. 90).

In response to questioning by Plaintiff's attorney, the VE stated that the above-cited jobs did not require close supervision (Tr. 91). The VE stated that the inclusion of the modifier "low-stress" to the original hypothetical question would not change the job findings (Tr. 92). The VE stated that in addition to her professional experience, her testimony was based on the information found in the *Dictionary of Occupational Titles* ("DOT"), the *Department of Labor Employment Quarterly Statistics*, and the her own analysis of the regional labor markets (Tr. 83-84).

*The ALJ closed the hearing by asking Plaintiff's attorney if he would consider amending the onset date to January, 2009, noting that documentation of CTS was not created until that month (Tr. 93). She stated that she was going "off the record" so counsel could discuss the proposed amendment with his client (Tr. 93).*

### D.    The ALJ's Decision

On January 29, 2010, ALJ Moore found that Plaintiff had not engaged in substantial gainful activity ("SGA") since the amended onset date of October 19, 2007 (Tr. 20). Citing Plaintiff's medical records, the ALJ found that Plaintiff experienced the "severe" impairments of "carpal tunnel syndrome, seizure disorder, cognitive disorder, depression, anxiety, borderline pulmonary disease, borderline intellectual functioning and substance abuse in remission" but that none of the conditions met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 20, 22).

-13-

The ALJ found that Plaintiff retained the residual functional capacity ("RFC") for light work with the following additional limitations:

> [D]oes not involve more than concentrated exposure to heat, hazards, and pulmonary irritants; overhead work with the right arm or work at or above shoulder level; more than simple, routine, repetitive work tasks; or more than incidental contact with the public.  Furthermore, he must have ready access to a restroom (Tr. 23).

Citing the VE's job findings, the ALJ determined that Plaintiff could perform the jobs of assembler, parts inspector and tester, and hand packager (Tr. 34).

The ALJ discounted allegations of disability, noting that neurologist Dr. Louis found only that Plaintiff "should modify his activity" when experiencing symptoms of CTS (Tr. 32).  The ALJ noted that Plaintiff's activities included doing laundry and other household chores; reading science fiction; and socializing with his brother and adult children (Tr. 32). The ALJ noted the presence of "mild" diagnostic findings and good responses to medication (Tr. 32).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is more than a scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and

-14-

"presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the

residual functional capacity to perform specific jobs existing in the national economy."
*Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### A.  Disability at Step Three.

Plaintiff argues first that the ALJ's failure to find disability as a result of mental retardation at Step Three of the analysis constitutes error.  *Plaintiff's Brief* at 3-7, *Docket #15*.  He cites Dr. Mills' January, 2009 findings which state that Plaintiff had a verbal IQ of 78, full scale IQ of 72, and performance IQ of 70.  *Id.* at 4 (citing Tr. 411).

"A Claimant who meets the requirements of a Listed Impairment will be deemed conclusively disabled, and entitled to benefits." *Reynolds v. Commissioner of Social Security,* 424 Fed.Appx. 411, 414, 2011 WL 1228165, *2 (6th Cir. April 1, 2011);  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  "Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the SSA considers to be 'severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.'" *Id.* (citing 20 C.F.R. § 404.1525(a)).

Listing 12.05, *Mental Retardation*, requires a showing of "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.  Plaintiff contends that he can show an onset of impairment before age 22 *and* one of the four additional criteria required to show disability under this listing:  "a valid verbal, performance, or full scale IQ

of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."   20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.05(C).

This argument is without merit.   Contrary to Plaintiff's contention, the fact that he attended special education classes in elementary school because he experienced difficulty paying attention, by itself, does not establish the onset of mental retardation before the age of 22 (Tr. 45).   He has not provided objective testing results showing the presence of mental retardation for this period or even alleged that such documentation exists.   Despite the fact that Plaintiff scored a 70 on one of the three IQ tests, neither Dr. Mills nor any of the treating or examining sources found that Plaintiff experienced mental retardation.   Instead, Dr. Mills expressly found that the IQ scores, analyzed alongside the clinical observations, pointed to borderline intelligence (Tr. 411).   The ALJ's finding of borderline intellectual functioning at Step Two did not require her discuss whether Plaintiff was mentally retarded at Step Three (Tr. 20).   As noted by Defendant, a finding of borderline intellectual functioning is not synonymous with mental retardation.   *Defendant's Brief* at 4, *Docket #22*; *see also Courter v. Commissioner of Social Sec.,* 479 Fed.Appx. 713, 716, 2012 WL 1592750, *2 (6th Cir. May 7, 2012)(despite a performance IQ of 65, the finding of borderline intellectual functioning, rather than mental retardation, was well supported by the clinical observations). In the present case, Dr. Mills described Plaintiff as "friendly, responsive, reserved, and cooperative," noting "good expressive language skills" with "spontaneous, clear, on target" responses (Tr. 410).   Further, Plaintiff's ability to obtain a GED and perform semiskilled

work in the past, evidence noted by the ALJ, stands at odds with a diagnosis of mental retardation (Tr. 33).

Plaintiff also argues that the  finding that he could "understand, retain, and follow simple instructions and perform simple, repetitive, and routine tasks" as stated by the ALJ (Tr. 26),  amounts to a misreading reading of Dr. Mills' findings, which actually stated that the  ability to "understand, retain, and follow simple instructions and perform simple, repetitive, and routine tasks" was "*mildly impaired*."  *Plaintiff's Brief* at 4-5 (citing Tr. 411).(Emphasis added).  However, Dr. Mills' statement that these abilities were "mildly impaired" does not show that he was incapable of a significant range of "simple, repetitive, and routine tasks" or that the ALJ misstated the  consultive examiner's conclusions.   Dr. Mills' finding that Plaintiff's ability to "understand, retain, and follow simple instructions" was *mildly* impaired (as opposed to moderately, markedly, or extremely) indicates limitations that do not create "more than a minimal limitation in [the] ability to do basic work activities."   20 C.F.R. § 404.1520a (d)(1).  Thus, the ALJ's conclusions are not inconsistent with Dr. Mills' findings.

### B.   The Hypothetical Question and RFC - Mental Limitations[5]

Plaintiff argues that the ALJ's "misinterpretation" of Dr. Mills' findings tainted both the hypothetical question to the VE and the RFC.  *Plaintiff's Brief* at 7-11.  He again asserts that the ALJ's inclusion of the modifiers of "simple, routine, repetitive work tasks on a sustained basis" did not reflect Dr. Mills'  additional finding that these abilities were "mildly

---

[5]Because Plaintiff's second and third arguments are based largely on the same body of evidence, they are combined here.

-18-

impaired." *Id* at 7 (Tr. 86). Once again, because the level of impairment was "mild," the fact that the ALJ did not cite Mills' conclusion in its entirety does not change the analysis.

Plaintiff is correct that a hypothetical question constitutes substantial evidence only if it accurately portrays the individual's physical and mental impairments. *Varley v. Commissioner of Health and Human Services,* 820 F.2d 777, 779 (6th Cir. 1987). However, as discussed above in section **A.,** the ALJ did not misstate or misinterpret Dr. Mills' original finding that Plaintiff's ability to do simple work was mildly impaired. Once again, "mild" symptomology equates with "insignificant" in Social Security parlance, 20 C.F.R. § 404.1520a (d)(1). Further, a February, 2009 Mental Residual Functional Capacity Assessment, based on Dr. Mills' findings, found Plaintiff's ability to understand, remember, and carry out very simple instructions was "not significantly limited" (Tr. 428). Notably, the non-examining Assessment had the same take on Dr. Mills' conclusions as the ALJ, finding that Plaintiff "retained the ability to do simple unskilled tasks [o]n a regular basis at this point" (Tr. 430). While Plaintiff characterizes this conclusion as one more misreading of Dr. Mills' findings, the exclusion of the qualifier "mildly impaired" does not undermine non-examining findings.

On a related note, Plaintiff argues that the hypothetical modifiers of "simple, routine [and] repetitive work do not account for his moderate deficiencies in concentration, persistence, or pace." *Plaintiff's Brief* at 8-11. He states that his performance IQ of 70 "shows that he may have difficulty with processing speed, and thus may have pacing problems in a job." *Id.* at 10-11. However, counsel's statement that his client "may have

difficulty with processing speed" stands unsupported by record evidence, which shows, if anything, that Plaintiff experienced some anxiety in dealing with the public. This was adequately addressed by the hypothetical limitation of "incidental contact with the public" (Tr. 86). Moreover, the ALJ based her finding of moderate concentrational difficulties on the fact that Plaintiff exhibited problems with "serial sevens" and "simple one-digit" calculations, rather than on anything remotely related to pacing deficiencies.

I am aware of a certain cases in this district in which the modifiers of "simple, routine, and repetitive" (or similar modifiers) have been found to be insufficient to account for the claimant's concentrational limitations. *Benton v. Commissioner of Social Sec.* 511 F.Supp.2d 842, 849 (E.D.Mich.,2007)(Roberts, J.)("simple, routine, repetitive work" insufficient to account for the claimant's moderate concentrational limitations); *See Edwards v. Barnhart,* 383 F.Supp.2d 920, 930 (E.D.Mich.2005)("simple, routine, unskilled work" not adequate to address moderate deficiencies in concentration, persistence, and pace). However, these cases do not stand for the proposition that "simple, routine, and repetitive" are *always* insufficient to account for moderate deficiencies in concentration, persistence, or pace. *See Lewicki v. Commissioner of Social Security*, 2010 WL 3905375, *2 (E.D. Mich. Sept. 30, 2010)(the modifiers of "simple routine work" adequately accounted for the claimant's moderate deficiencies in concentration, persistence, or pace); *Hess v. Comm'r of Soc. Sec.,* No. 07–13138, 2008 WL 2478325, *7 (E.D.Mich. June 16, 2008). Similarly here, the modifiers of simple, routine, repetitive work, along with the fact that these jobs were all characterized

-20-

as "low stress" positions (Tr. 92) adequately addressed the concentrational and psychological limitations supported by the record.

## C.   The Hypothetical Question and RFC - Physical Limitations

Plaintiff states that the hypothetical limitations that formed the basis of the job findings and RFC did not adequately account for his limitations as a result of CTS. *Plaintiff's Brief* at 11-13.  He cites the VE's testimony that if the hypothetical question were amended to limit repetitive handling to one third of the time, all work would be precluded. *Id.* at 12-13 (citing Tr. 88).

By itself, Plaintiff's testimony regarding limitations as a result of CTS appears compelling.  He stated that his hands became "tingly" and that he was unable to afford recommended surgery for both CTS and rotator cuff problems (Tr. 67, 70-71).   He stated that despite the need for surgery, his treatment was limited to wrist splints (Tr. 67).   While January, 2009 nerve conduction studies showed  median mononeuropathy at both wrists, greater on the right than left (Tr. 400, 495).

However, the treating and examining records paint a different picture.  Plaintiff's testimony that he was refused recommended surgery because of his inability to pay stands at odds with his February, 2009 statement to Dr. Louis (an examining specialist) that he wanted surgery or prescription splints while he still had medical insurance (Tr. 434).  While the January, 2009 nerve conduction studies showed some degree of CTS (Tr. 400, 495), the condition was characterized by Dr. Louis, as "mild" (Tr. 435).   Despite the fact that Plaintiff

was in fact covered by an insurance plan at the time of the examination by the  orthopaedic surgeon, he was informed by Dr. Louis that he was not a surgical candidate (Tr. 435). Further, just one month after the examination by Dr. Louis, Plaintiff did not demonstrate problems performing manipulative activities (Tr. 438-441). Likewise, a Residual Functional Capacity Assessment found the ability to lift 50 pounds occasionally and 25 frequently and the absence of all manipulative limitations (Tr. 449).  The record does not support the hypothetical restriction of  repetitive handling limited to one third of the workday. Accordingly, the ALJ did not err in declining to include the restriction in either the hypothetical question or RFC.

While Plaintiff notes the ALJ proposed an amendment of the alleged onset of disability date to January 1, 2009 to reflect the diagnosis of CTS at the conclusion of the hearing, the ultimate conclusion that the condition did not create limitations that exceeded those in the hypothetical question is abundantly supported by the record.

Because the ALJ's findings were well supported and comprehensively explained, the administrative findings should not be disturbed.  While my recommendation should not be read to trivialize Plaintiff's conditions or personal problems, the ALJ's determination, well within the "zone of choice" accorded the administrative fact-finder, should remain undisturbed by this Court.  *Mullen v. Bowen*, *supra*.

## CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment [Doc. #22] be GRANTED, and that Plaintiff's Motion for Summary Judgment [Doc. #15] be DENIED.

Any objections to this  Report and Recommendation must be filed  within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.  1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/ R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Date:  February 19, 2013

-23-

CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail disclosed on the Notice of Electronic Filing on February 19, 2013.

s/Johnetta M. Curry-Williams
Case Manager